1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    GHAUS MALIK, et al.,                     No.  2:23-cv-1344-CKD

12                 Plaintiffs,

13        v.                                    ORDER

14    FARHAN MALIK, et al.,

15                 Defendants.

16

17          Plaintiffs Ghaus Malik and G. and P. Malik LLC ("GPM") brought this action for fraud,

18    conversion, and elder abuse against defendants Farhan and John Malik.[1]  This action proceeds on

19    the Third Amended Complaint (TAC).  (ECF No. 60.)  Farhan and John[2] have filed counterclaims

20    for collection of debt and unjust enrichment.  (ECF Nos. 96 & 98.)

21          Before the court is Farhan Malik's motion for summary judgment (ECF No. 120); see

22    ECF Nos. 122 & 122-1 (evidence in support of motion).  Plaintiffs have opposed the motion

23    (ECF No. 124), and Farhan has filed a reply (ECF No. 126).  Also before the court is John

24    Malik's motion for summary judgment (ECF No. 123).  Plaintiffs have opposed (ECF No. 125),

25    _____

26    [1] On September 17, 2024, plaintiffs' breach of fiduciary claims against Farhan and John Malik
      were dismissed, and claims against two other defendants were sent to binding arbitration. (ECF
27    No. 92.)

28    [2] As the parties share a surname, the court will refer to them by their first names.

                                              1

1    and John has filed a reply (ECF No. 131).[3]

2          On October 20, 2025, the Court held a hearing via Zoom videoconference on the pending

3    motions.  Dan Cortright appeared on behalf of plaintiff Ghaus Malik, who was present, and

4    Wendy Green appeared on behalf of Farhan Malik, who was not present. John Malik appeared

5    pro se.  At the conclusion of the hearing, the Court took the motions under submission.  (ECF No.

6    133.)

7        I.     The Complaint

8          The Third Amended Complaint (TAC), described in detail in an earlier order (ECF No. 92

9    at 2-5), can be summarized as follows:

10         Plaintiffs allege that Ghaus registered the California company GPM in 1995, and that this

11   company has never been dissolved, remains in good standing, and is a co-plaintiff in this action.

12   (TAC, ¶ 3.)

13         In 2000, GPM's operating agreement named Ghaus sole manager of the company with

14   complete control over its management and assets.  John and Farhan owned a combined 66% of

15   the company but were nonvoting members. (TAC, ¶ 12.)

16         In 2018, an amended operating agreement (AROA) was executed, and Ghaus transferred

17   GPM's registration from California to Delaware.  (TAC, ¶¶ 13, 17.)  In March 2018, Ghaus sold

18   property owned by GPM and trusted John to handle the sales and taxation paperwork.  Ghaus

19   subsequently learned that "he and his wife Parveen had purportedly been bought out of the LLC

20   by" John and Farhan.  (TAC, ¶ 31.)

21

22   [3] On September 5, 2025, plaintiffs filed a cross-motion for summary judgment (ECF No. 125),
     which was subsequently briefed (ECF Nos. 126 & 129).  Plaintiffs assert in briefing that Fed. R.

23   Civ. P. 56 allows "motions for summary judgment at any point."  (ECF No. 129 at 4.)  They also
     invoke the Local Rules, but they do not address the dispositive motion deadline. (See ECF No.

24   116.)  The motion is untimely.  However, the Court will consider its points and authorities as part
     of plaintiff's opposition.  See Hawkins v. State of California, 2015 WL 2454275, *2 (E.D. Cal.

25   May 22, 2015) ("Plaintiff's cross-motion for summary judgment was untimely filed, and will not
     be addressed here as such. However, the Court will consider the points and authorities raised

26   therein as part and parcel of Plaintiff's opposition with which it was filed."); see also CSPC
     Dophen Corp. v. Hu, 2022 WL 2835124, *3 (E.D. Cal. July 20, 2022) (collecting cases); Fed. R.

27   Civ. P. 16(b).

28

In June 2021, Farhan and John "held a secret meeting" to purportedly dissolve GPM, even though they lacked legal authority to do because Ghaus remained sole manager under the AROA. (TAC, ¶ 21.)  In July 2021, Ghaus attempted to review GPM's bank records and was denied access to the account.  (TAC, ¶ 22.)  After purportedly dissolving the company, Farhan and John distributed GPM's assets among themselves.  (Id.)  In July 2021, Farhan informed Ghaus that he and John had voted to dissolve GPM in a shareholder's meeting, that the company was in the dissolution phase, and that Ghaus was no longer the manager.  (TAC, ¶¶ 24-25.)

In March 2023, Ghaus transferred the registration of GPM from Delaware back to California.  (TAC, ¶ 20.)

Plaintiffs bring claims of fraud, conversion, and elder abuse against John and claims of conversion and elder abuse against Farhan.  Plaintiffs also seek injunctive relief expelling John and Farhan from GPM.

## II.  Defendants' Counterclaims

Farhan brings counterclaims of collection of debt and unjust enrichment.  (ECF No. 98.) He alleges that GPM ceased to operate on December 31, 2021.  As of that date, Ghaus allegedly owed GPM $579,276.01 in unpaid loans. On April 21, 2022, $303,658.00 of the debt was distributed to John and $275,618.01 was distributed to Farhan.  Ghaus has not responded to a September 29, 2024 demand letter from John and Farhan seeking reimbursement.  Farhan seeks damages of $275,618.01. (Id., ¶¶10-14.)  John also brings counterclaims of collection of debt and unjust enrichment, alleging the same facts and seeking damages of $303,658.00.  (ECF No. 96, ¶¶ 10-14.)

Plaintiffs have filed answers to Farhan's and John's counterclaims.  (ECF Nos. 100 & 101.)

## III.  Farhan's Motion for Summary Judgment

The Court first considers plaintiffs' claims of conversion and elder abuse against Farhan, as set forth below.

### A.  Factual Disputes and Evidentiary Objections

The following facts are undisputed unless otherwise stated. Where a genuine dispute

1   exists, the court draws reasonable inferences in favor of the non-moving party.  Tolan v. Cotton,

2   134 S. Ct. 1861, 1868 (2014).  This is true even where cross-motions are filed, as each motion

3   must be considered on its own merits.  Nat'l Grange of the Order of Patrons of Husbandry v.

4   California State Grange, 115 F. Supp. 3d 1171, 1177 (E.D. Cal. 2015), aff'd, 715 F. App'x 747

5   (9th Cir. 2018).  Parties may object to the evidence cited by another party to prove the undisputed

6   facts.  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 385–86 (9th Cir. 2010).  But the evidentiary

7   admission standard at summary judgment is lenient: A court may evaluate evidence in an

8   inadmissible form if the evidentiary objections could be cured at trial.  See Burch v. Regents of

9   the Univ. of Cal., 433 F. Supp. 2d 1110, 1119–20 (E.D. Cal. 2006).  "Admissibility at trial"

10  depends not on the evidence's form, but on its content.  Block v. City of L.A., 253 F.3d 410, 418–

11  19 (9th Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

12      B.  Relevant Facts

13          On April 13, 2000, the original Articles of Organization for G. and P. Malik LLC were

14  signed by Ghaus and filed with the California Secretary of State.  Farhan's Undisputed Facts

15  (FUF) 1 (ECF No. 124-1).  Approximately $3 million of Ghaus' personal income was used to

16  purchase and develop company's almond ranch.   Ghaus' Undisputed Facts (GUF) 32 (ECF No.

17  126-1).

18      1.  January 2018: Amended Operating Agreement for California LLC

19          On January 21, 2018, the LLC's five members deemed executed an Amended and

20  Restated Operating Agreement ("AROA").  FUF 4, 5; Farhan's Ex. G (ECF No. 122-1 at 65-78).

21  The AROA had been drafted by attorneys of John's choosing, and Ghaus had no input into its

22  preparation.  GUF 2 & 3.  The member allocations in the AROA were: ½ of 1% to Ghaus, ½ of

23  1% to Ghaus' wife Parveen (since deceased), 33% to Farhan, 33% to John, and 33% to Ghaus'

24  daughter Saira.  FUF 4.  Ghaus signed the AROA on January 25, 2018.  FUF 6.  Ghaus was

25  unaware that the AROA contained language providing that a decision by the majority of members

26  could dissolve the LLC.  GUF 4; see Farhan's Ex. G (ECF No. 122-1 at 73).

27          In deposition, Ghaus testified that the AROA was "created by John Malik. . . . I signed

28  everything without reading any document he created for me."  Ghaus Depo. 38:2-4 (ECF No.

122-1 at 105).  Ghaus can read English.  FUF 34.  In his declaration, he stated that, as a result of being 85% blind in one eye and a detached retina in the other, he does not see well and has "significant difficulty reading documents[.]"  Ghaus Decl., ¶ 2 (ECF No. 124-5.)

### 2. February 2018: John and Ghaus Tax Discussion

On February 4, 2018, Ghaus and John exchanged text messages about ways to pay less tax with respect to the LLC.  FUF 8-11.  John texted Ghaus that he was "checking with my accountant now . . . I will get a reliable answer."  FUF 9.  John also texted Ghaus: "[W]e have to plan ahead because certain documentation needs to be changed so that is why I am thinking of these things now."  FUF 10.  On that day, Ghaus understood that John would be creating some kind of documentation in order to save taxes.  FUF 11.  The parties dispute whether or to what extent Ghaus understood that this documentation would involve selling his LCC membership interest.

### 3. March 2018: Transfer of the LLC to Delaware

At John's insistence, the LLC's registration was moved from California to Delaware.  GUF 5.  On March 23, 2018, Ghaus executed a Plan of Conversion for converting the original LLC, a California limited liability company, to G. and P. Malik LLC, a Delaware limited liability company.  FUF 12.  Ghaus signed and filed Certificates of Conversion with the California and Delaware Secretaries of State.  FUF 13-14.  Ghaus also executed and filed a Certificate of Formation with the Delaware Secretary of State and, on March 26, 2018, the Delaware Secretary of State issued a Certificate of Good Standing for the converted Delaware LLC.  FUF 15-16.  Ghaus consented to the conversion to a Delaware company.  FUF 17.

On March 26, 2018, Ghaus signed a one-page accounting schedule prepared by John.  FUF 19, Farhan's Ex. S (ECF No. 122-1 at 206).  Under Section 1 of the AROA, the schedule set out the following economic allocations to members: The first $1.15 million of income to Ghaus, the next $1 million of income to Parveen, half of the income (after Ghaus and Parveen had been paid) to each of John and Farhan, and $0 to their sister Saira.  FUF 19; Farhan's Ex. S.

### 4. March 2018: Ghaus signs Membership Purchase Agreement

On March 30, 2018, Ghaus signed a two-page Membership Interest Purchase Agreement

1  (MIPA) "by and among Paveen Malik and Ghaus Malik (collectively, the "Sellers' and each a

2  'Seller') and John Malik ('Buyer') in relation to G. and P. Malik, LLC, a Delaware limited

3  liability company (the 'Company')."  FUF 20; Farhan's Ex. T (ECF No. 122-1 at 208).  As set

4  forth in the MIPA, Ghaus and Parveen sold their combined share in the company to John for $2.1

5  million, consistent with the accounting schedule setting out $1 million as Parveen's share and

6  $1.15 million as Ghaus' share.  FUF 20; Farhan's Ex. T.  The MIPA stated in part:

7  
8  
9  
10  
11  
> Subject to the terms and conditions of this Agreement, the Sellers hereby sell to Buyer . . . all of membership interests of the Company owned by the Sellers . . . at an aggregate price of $2,100,000 (the 'Purchase Price') . . . The Sellers and Buyers agree that the purchase and sale of the Selling Interests shall be deemed effective for purposes of this Agreement as of the Effective Date.  Each Seller acknowledges and agrees that of the Effective Date, such Seller is no longer an owner of the company and has no right, title and interest to the Selling Interests.

12  Farhan's Ex. T.  Ghaus signed the MIPA on his own behalf and as sole manager of the company.

13  FUF 21; Farhan's Ex. T.  At his March 14, 2025 deposition, Ghaus testified that he did not read

14  this two-page agreement before signing it, adding: "I never read anything sent to me by my MBA

15  son. . . . I don't have any reason to doubt that I must read every word one by one."  Ghaus Depo.,

16  176:22-177: 1 (ECF No. 122-1 at 149-150).

17      On April 1, 2018, Ghaus sent John a text message stating in part: "I also need to get all the

18  money this year to cancel my capital gains against the losses."  John texted back: "Yes, the

19  documents that I sent you cover all of that."  John also texted: "The one that is two to three pages

20  is the one designed to get you the gain [im]mediately."  FUF 23.  The same day, John sent Ghaus

21  a message stating in part: "in order to get the [gain] now [Mom] has to withdraw from the

22  partnership and so do you, so this is like the final amount."  GUF 14; Farhan Ex. K (ECF No.

23  122-1 at 130-131).

24      On May 4, 2018, John told Ghaus via text message that Ghaus could write off his capital

25  gain on his 2018 tax return.  FUF 27.  That same day, John texted Ghaus: "I don't know if it

26  works for you to send 45K to the LLC anymore because you are no longer a member.  I

27  personally bought you out for $1.15 million payable in 1 year in order to accelerate your capital

28  gains."  FUF 30; Farhan Ex. K (ECF No. 122-1 at 132).  In the same exchange, John also stated:

1  "It is based on a contract we signed where you sold your LLC share to me."  Farhan Ex. K (ECF

2  No. 122-1 at 133.)

3      In his deposition, Ghaus testified he received John's May 4, 2018 messages that he was no

4  longer a member of GPM, but it was "so out of reality that it doesn't need to be considered.  You

5  have no authority to tell me I am a member or not a member.  I'm the owner and creator of an

6  LLC worth $7.2 million."  Ghaus Depo., 180:1-8 (ECF No. 122-1 at 153.)  Despite the above

7  messages, Ghaus testified that he considered the sale of his interest in the LLC "not possible" and

8  at odds with "common sense."  Ghaus testified that had "the checkbook for $7.2 million worth of

9  LLC" and "[i]t doesn't matter what you write to me."  Ghaus Depo., 186:5-187:21 (ECF No. 122-

10  1 at 157-158).

11      Ghaus took advantage of the capital gains tax benefit on his 2018 return.  FUF 28.

12      5.  2019-2020 Events

13      John paid Ghaus $1,175,000.00 with a personal check dated August 20, 2019.  FUF 36;

14  Farhan Ex. V (ECF No. 122-1 at 228).  In late July and early August 2020, Ghaus objected that he

15  never intended to sell his LLC interest to John.  GUF 18.

16      6.  June 2021: John and Farhan's Claimed Dissolution of the Delaware Company

17      On March 10, 2021, a Certificate of Cancellation was filed with the California Secretary

18  of State regarding the converted original LLC.  FUF 37.

19      On June 9, 2021, John and Farhan held a Zoom meeting regarding a Resolution to

20  Dissolve G and P. Malik LLC, now based in Delaware.  FUF 38; Farhan Ex. X (ECF No. 122-1 at

21  232.)  They were the only members present.  Farhan Ex. X.  The meeting minutes indicate that

22  Farhan, with a 57% ownership interest, voted in favor of the Resolution, and John, with a 42%

23  ownership interest, abstained from voting.  Id.  The attached Resolution provides in part:

24          It is resolved by the Company, pursuant to Section 9.1(b) of the
           Company's [AROA][4], dated January 1, 2018 ("Operating
25

26  _____

   [4] As noted above, Section 9.1 of AROA provides: "The Company shall dissolve upon the
27  occurrence of any of the following events: (a) Upon the entry of a decree of judicial dissolution
   …; (b) Upon a decision of the majority of the Members to dissolve the Company; or (c) The Sale
   of all or substantially all the assets of the Company."  Farhan's Ex. G (ECF No. 122-1 at 73).
28

7

1       Agreement"), that the actions described herein shall be taken:

2              . . . that the Company . . . shall distribute all of its assets to its
        Members;

3

4              . . . that after the date hereof the Company shall cease to be a going
        concern and its activities shall merely be for the purposes of
        disposing all its assets and winding up its affairs by its Members in

5       accordance with section 9.2 of the Operating Agreement . . . ;

6              . . . that upon the dissolution and complete winding up of the
        Company by its Members, pursuant to Section 9.2 of the Operating

7       Agreement, the Company shall execute and file a Certificate of
        Cancellation [in Delaware] and, upon such filing, the separate legal

8       existence of the Company shall be terminated; and

9              . . . that Farhan Malik is appointed [and] authorized . . . to take any
        and all other actions . . . as [he] may deem necessary . . . in order to

10      consummate the transactions contemplated hereby[.]

11  Farhan Ex. X.

12      7. <u>March 2023: Ghaus' Claimed Transfer of the LLC back to California</u>

13          Nearly two years later, in March 2023, Ghaus considered the third-party company CT

14  Corporation to be his agent.  FUF 39.  Ghaus instructed CT Corporation to transfer the LLC's

15  registration from Delaware back to California.  FUF 20.  On March 17, 2023, a Certificate of

16  Cancellation for the LLC was filed with the Delaware Secretary of State on behalf of Ghaus.

17  FUF 40; Farhan Ex. Y (ECF No. 122-1 at 238-240.)  That same day, Articles of Organization for

18  a California Limited Liability Company were filed for G. and P. Malik LLC with the California

19  Secretary of State.  FUF 41; Farhan Ex. Z (ECF No. 122-1 at 243.)

20          On March 21, 2023, Kelly Dagget of CT Corporation sent an email to Ghaus stating:

21  "Good news!  Our Delaware cancellation for G. and P. Malik LLC has been completed . . . We

22  are still waiting on the California registration."  FUF 43; Farhan Ex. Y (ECF No. 122-1 at 241.)

23  The Delaware Secretary of State's certified list of documents contains a Certificate of

24  Cancellation for G. and P. Malik occurring March 17, 2023, but it does not contain a Certificate

25  of Transfer for that time period.  FUF 45.  Plaintiffs contend that, in March 2023, Ghaus

26  transferred the LLC's registration from Delaware back to California.  A California company

27  named G. and P. Malik LLC is a co-plaintiff in this action.

28  /////

1    C.  Legal Standard

2         Summary judgment is appropriate when it is demonstrated that there "is no genuine

3    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

4    Civ. P. 56(a).  A party asserting that a fact cannot be disputed must support the assertion by

5    "citing to particular parts of materials in the record, including depositions, documents,

6    electronically stored information, affidavits or declarations, stipulations (including those made for

7    purposes of the motion only), admissions, interrogatory answers, or other materials. . ."  Fed. R.

8    Civ. P. 56(c)(1)(A).

9         Summary judgment should be entered, after adequate time for discovery and upon motion,

10   against a party who fails to make a showing sufficient to establish the existence of an element

11   essential to that party's case, and on which that party will bear the burden of proof at trial.  See

12   Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] complete failure of proof concerning an

13   essential element of the nonmoving party 's case necessarily renders all other facts immaterial."

14   Id.

15        If the moving party meets its initial responsibility, the burden then shifts to the opposing

16   party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

17   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

18   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

19   of their pleadings but is required to tender evidence of specific facts in the form of affidavits,

20   and/or admissible discovery material, in support of its contention that the dispute exists or show

21   that the materials cited by the movant do not establish the absence of a genuine dispute.  See Fed.

22   R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the

23   fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

24   governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

25   Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

26   genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

27   party,  see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

28        In the endeavor to establish the existence of a factual dispute, the opposing party need not

establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

D. Analysis

Plaintiffs assert claims of conversion and elder abuse against Farhan Malik.  Farhan argues that plaintiffs lack standing to pursue any of their claims, and that the claims are barred by the statutes of limitations.

To evaluate these claims, the court addresses three preliminary questions.  First, was Membership Interest Purchase Agreement, signed by Ghaus in March 2018, a valid and enforceable contract?  Second, if so, what were its effects?  Third, is co-plaintiff G. and P. Malik LLC the same company incorporated in California in 2000, transferred to Delaware in 2018, and transferred back the California in 2023, or is it a new company created in California in 2023?

1. Formation of the MIPA

On June 30, 2000, an action by the California company GPM resolved that Ghaus was the Manager and CEO.  (TAC, Ex. 1.)  Ghaus and his wife Parveen were voting members, while

10

1  Farhan, John, and their sister were non-voting members.  (Id.)  The action provided that,

> except as expressly provided for in the Operating Agreement for this
> Company, or otherwise authorized by the Manager of this Company,
> members Farhan . . . John . . . and Saira . . . shall have no right to
> vote on or influence the business decisions of the Manager . . . of this
> Company, . . . to expend any monies or incur any debts . . . on behalf
> of . . this Company, or to otherwise act on behalf of or in the name
> of this Company.

6  (Id.) (emphasis added).

7        In January 2018, GPM's five members executed an Amended and Restated Operating

8  Agreement (AROA)[5], which replaced the original operating agreement from April 2000 "in its

9  entirety and shall be the operating agreement for the Company[.]"  (AROA, ¶ D.)  The AROA

10  provided that the Manager, Ghaus, had full and exclusive authority to manage and control GPM,

11  subject to certain limitations, and that the Members had no power to participate in management of

12  the company, with certain exceptions.  (¶¶ 1.7, 4.1(a)-(b).)  GPM's income was to be "allocated to

13  and among the Members as determined . . . by the manager . . . [and] in the discretion of the

14  Manager."  (¶ 6.1.)  In section 9.1, the AROA provided that "the Company shall dissolve" upon

15  the occurrence of one of three conditions, including "a decision of the majority of the Members to

16  dissolve the Company."  The AROA "replac[ed] and superced[ed] all prior written and oral

17  agreements among the Manager and Members."  (¶ 13.1)  Ghaus signed and executed the AROA

18  on January 25, 2018.

19        Plaintiffs argue that John talked Ghaus into changing the original operating agreement,

20  and that section 9.1 of the AROA, providing for dissolution upon a member vote, was

21  "surreptitiously insert[ed]" by John's lawyers.  (ECF No. 124 at 8.)  In his August 2025

22  declaration, Ghaus states that he "was unaware that the AROA contained a provision where the

23  members could purportedly dissolve the LLC without my consent as sole Manager.  I never

24  would have knowingly agreed to such a provision."  (ECF No. 124-5, ¶ 13.)  In fact, at his

25  February 2025 deposition, Ghaus testified that he never read any document John gave him to

26  sign, stating: "I signed everything without reading any document he created for me. . . . I signed

27  _____

28  [5] ECF No. 122-1 at 65-78 (copy of AROA); see § 13.4 (interpretation governed by California law).

1    everything he put in front of me without reading anything." (ECF No. 122-1 at 105.) Ghaus did

2    not testify that he was unable to read these documents due to vision problems; he simply testified

3    that he didn't read them. See Brown v. Wells Fargo Bank, N.A., 168 Cal. App. 4 th 938, 959

4    (2008) ("Generally, it is not reasonable to fail to read a contract; this is true even if the plaintiff

5    relied on the defendant's assertion that it was not necessary to read the contract.") (citing

6    Rosenthal v. Great Western Fin. Sec. Group, 14 Cal. 4th 394 (1996)). While plaintiffs suggest

7    Ghaus was deceived into agreeing to certain terms in the AROA, they stop short of arguing it was

8    non-binding, and they acknowledge its provisions bear upon the MIPA.

9         On or about March 30, 2018, Ghaus signed another contract, both as an individual and as

10   sole manager of GPM.[6] The MIPA was a two-page document that provided for the "purchase and

11   sale of membership interests" for a total price of $2.1 million. Its introductory paragraph named

12   Ghaus and Parveen as the "Sellers," John as the "Buyer," and GPM as the "Company" at issue.

13   In section 1, the MIPA provides that "[e]ach Seller acknowledges and agrees that as of the

14   Effective Date, such Seller is no longer an owner of the company and has no right, title and

15   interest to the Selling Interests. Section 4.6 provides that the MIPA "constitutes the entire

16   agreement between the parties with respect to the subject matter . . . and supersedes any and all

17   prior agreements or understandings, whether oral or written, with respect to such subject matter."

18        Plaintiffs argue that Ghaus was again deceived about what he was signing, such that the

19   MIPA is not a valid, binding agreement. Plaintiffs allege that John had a "scheme to steal all of

20   the LLC's cash proceeds" and had the MIPA "prepared behind Ghaus' back," knowing that

21   Ghaus trusted John not to "deceive or defraud him." (ECF No. 124 at 9-10.) Because John never

22   explained to Ghaus that "the MIPA was a document that would result in him buying Ghaus' and

23   Parveen's membership interests," plaintiffs argue, there was no "meeting of the minds" as needed

24   for a valid contract. (Id. at 11.) Had Ghaus read the two-page MIPA, however, or even its title,

25   the nature of the *membership interest purchase agreement* was clear and straightforward. Yet

26   Ghaus testified in deposition that he didn't read the MIPA:

27

28   _____
     [6] ECF No. 122-1 at 208-210 (copy of the MIPA).

1

2

> Q: Did you understand you signed a document as of May 4th, 2018 that sold your interest in the LLC to John?

3

4

> A: No, because it is impossible and illegal that I can do so.  Nobody can buy – sell $7.2 million takeover and say oh, we signed a contract.  Okay, I signed the contract.  I don't deny it. . . . If you sign this, that doesn't make it legal.

5 (ECF No. 122-1 at 117.)  Nonetheless, Ghaus had an opportunity to discover the terms of the

6 MIPA before he signed.  There is no evidence that he was rushed into signing, or that he raised

7 questions about it that weren't answered before signing.[7]

8          Per § 4.4 of the agreement, the MIPA is governed by Delaware Law.  "In determining the

9 enforceability of a choice of law provision in a diversity action, a federal court applies the choice

10 of law rules of the forum state, in this case California."  Hatfield v. Halifax PLC, 564 F.3d 1177,

11 1182 (9th Cir. 2009).  "If the parties state their intention in an express choice-of-law clause,

12 California courts ordinarily will enforce the parties' stated intention."  Id.  "However, simply

13 because there is a choice of law provision within the [contract] does not mean that it covers each

14 claim . . . The appropriate law to apply must be determined on a claim by claim [basis]."  Fang v.

15 CMB Export Infrastructure Investment Group 48, 773 F. Supp. 3d 963, 979 (E.D. Cal. 2025)

16 (citing Zinser v. Accufix Rsch. Inst., Inc., 253 F.3d 1180, 1188 (9th Cir. 2001) ("the three-part

17 California choice of law inquiry requires comparison of each non-forum state's law and interest

18 with California's law and interest *separately*." (emphasis in original)).

19          Here, both parties cite California law in arguing whether Ghaus was fraudulently induced

20 to sign the MIPA.  However, "California district courts have held that fraudulent inducement

21 claims need not be governed solely by California law."  Cain v. Int'l Fruit Genetics, LLC, 2024

22 WL 4570605, *7 (E.D. Cal. Oct. 24, 2024) (collecting cases).  In Cain, the district court found

23 that the parties' choice of law controlled and Delaware law applied to plaintiff's fraud in the

24 inducement claim.  Id.  Here, where plaintiffs assert conversion and elder abuse claims and both

25 sides analyze contract formation under California law, the Court reviews the formation of the

26 MIPA under both Delaware and California law. Either way, the result is the same.

27

28

---

[7] Notably, the AROA permits a member to sell his interest in the company, with the consent of the manager (Ghaus).  See AROA, §§ 7.2 & 11.1.

In Delaware, to show fraudulent inducement, "plaintiff must plead with particularity the following elements: (1) a false representation of material fact; (2) the defendant's knowledge of or belief as to the falsity of the representation or the defendant's reckless indifference to the truth of the representation; (3) the defendant's intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance." Cain, 2024 WL 4570605, *7 (citing Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd., 2016 WL 5243950, at *7 n.34 (Del. Ch. Sep. 22, 2016)). In Chapter 7, the Delaware court found that plaintiff failed to plead facts showing fraudulent inducement because "it is unreasonable to rely on oral representations when they are expressly contradicted by the parties' written agreement. . . . The Court . . . must be guided by what the parties say in their written contracts; it cannot be distracted by misguided allegations of fraud or estoppel, no matter how passionately they might be pled." Id. at **7, 9. Plaintiffs complain that John failed to explain the MIPA's terms to Ghaus, when he could have simply read it himself and asked questions before agreeing to the terms. They have not shown fraudulent inducement under Delaware law.

Similarly, under California law, "fraud does not render a written contract *void* where the defrauded party had a reasonable opportunity to discovery the real terms of the contract." Rosenthal, 14 Cal. 4th at 419-420 (emphasis in original). If a plaintiff claims he was "unaware" of a contract's terms, "his failure to read [the contract] . . . is a result of his own negligence and does not amount to fraud." Barnes v. Crown Jewels, LLC, 2014 WL 4929052, *4 (C.D. Cal. Oct. 1, 2014) (citing Rosenthal, 14 Cal. 4th at 423).

Around the time Ghaus signed the MIPA, in April and May 2018, John texted Ghaus that Ghaus and Parveen "[have] to withdraw from the partnership" in order to get a 2018 tax advantage, and that he, John, "personally bought you out for $1.15 million." There is no evidence that Ghaus questioned these statements or expressed confusion about them, either because he had some knowledge of what the MIPA entailed or some other reason. In any case, plaintiffs have not created a genuine dispute of fact as to fraudulent inducement. Ghaus' 2018 federal tax return

/ / / /

14

1    reflected the sale of his interest for $1.15 million, and John paid Ghaus $1,175,000 by check.[8]

2    Based on the evidence presented, the MIPA is valid as a matter of law.

3        2.  Effects of the MIPA

4        Plaintiffs assert that, even if Ghaus sold his membership interest in the MIPA, he

5    remained the company's sole manager, as set forth in the AROA.  As noted above, the AROA

6    provided that, as manager, Ghaus, had exclusive authority to manage and control GPM, and that

7    Farhan and John had little to no control.  (¶¶ 1.7, 4.1(a)-(b).)  Farhan argues that sale of Ghaus'

8    interest in the company, in the MIPA described above, ended his control under the AROA.

9        Under Delaware law, a "member ceases to be a member and to have power to exercise any

10   rights or powers of a member upon assignment of all of the member's [LLC] interest."  Del.

11   Code. Ann. Tit. 6 § 18-702(b)(3).  Similarly, under California law, a "person is dissociated as a

12   member from a [LLC] when . . . [t]here has been a transfer of all the person's transferable interest

13   in the [LLC][.]"  Cal. Corp. Code § 17706.03(a)(2).  Farhan contends that, under both states'

14   laws, when Ghaus sold (assigned) his interest in GPM in the MIPA, he lost his power to control

15   the company, regardless of the "manager control" provisions of the AROA.

16       Plaintiffs argue that, per the AROA, "no matter whether the Manager has any membership

17   interest or not, the Manager *alone* has all powers and authority to act with respect to ANY

18   business of the LLC[.]"  (ECF No. 124 at 16.)  They cite no case law for this claim, and, when

19   questioned at the hearing, plaintiffs' counsel did not provide any case support for this position.

20   The Court concludes that, as a matter of law, Ghaus lost the control over the company, which he

21   previously had under the AROA, when he ceased to be a member in 2018.

22       3.  Post-2023 California LLC

23       The third preliminary question is whether co-plaintiff G. and P. Malik LLC is the same

24   company incorporated in California in 2000, transferred to Delaware in 2018, and transferred

25   back the California in 2023, as plaintiffs claim.

26   _____

27   [8] Ghaus states that John's payment to him was a "short-term loan," which Ghaus paid back in
     September 2019. (ECF No. 124-5 at 10; see ECF No. 125-6 at 39.)  Ghaus does not argue that the
28   contract was invalid for lack of consideration, however, and it is undisputed that he obtained 2018
     tax benefits as a result.  See FUF 28, 35.

In 2021, a Certificate of Cancellation was filed in California as to GPM.  In 2023, a certificate of cancellation was filed in Delaware as to GPM, and articles of incorporation were filed for a California company called GPM.  At the hearing, plaintiffs' counsel stated that Ghaus "intended" to transfer the Delaware company to California in 2023; however, there is no evidence he took formal steps to do so, as he did when converting GPM to a Delaware company in 2018.  See Del. Code Ann. Tit. 6 § 18-213 (providing steps for transferring Delaware company to another jurisdiction).  Nor did Ghaus or his agent file the documents required to convert GPM to a California company under California law.  See Cal. Corp. Code § 17710.08 (providing steps for conversion of a foreign LLC to a domestic LLC); see Chandler v. Extended Stay America, 2020 WL 8991729, *2 (S.D. Cal. July 10, 2020) (companies "formed under the laws of Delaware [are] considered foreign LLCs in California" under § 17701).

In fact, by 2023, Ghaus had no control or authority over the Delaware company GPM; he had sold his interest in it five years earlier.  The Court concludes that co-plaintiff GPM is a new company, registered by Ghaus in California in 2023.

### 4.  Conversion and Elder Abuse Claims

Plaintiffs assert claims of conversion and elder abuse against both defendants based on events in the summer of 2021.  See Lee v. Hanley, 61 Cal. 4th 1225, 1240 (2015) (conversion elements under California law); Levin v. Winston-Levin, 39 Cal. App. 5th 1025, 1034 (2019) (financial abuse elements under California law); see also ECF No. 124 at 17 ("Plaintiffs' claims in this action are all based on the actions taken by John and Farhan in June/July 2021 whereby they purportedly dissolved the LLC and distributed all of its cash to themselves in . . . violation of . . . Ghaus' sole and exclusive authority [as manager].").

Plaintiffs allege that Farhan and John illegally took possession of funds in the LLC's operating account, including funds from the sale of GPM's real property, without Ghaus' consent.  (TAC, ¶¶ 44, 45, 47.)  The brothers allegedly "agreed that they would steal all the funds in the LLC's operating account for their own use and prevent Plaintiffs from accessing those funds thereafter."  (TAC, ¶ 51.)  The alleged scheme involved "checks written to Farhan and John Malik's own accounts from the LLC funds" in the amount of approximately $6 million.  (TAC, ¶¶

16

51, 53.)  In fact, the parties do not meaningfully dispute the facts of what occurred in June and July 2021. Plaintiffs contend that John and Farhan's acts of voting to dissolve the company and splitting its assets between them were unlawful, while defendants contend these acts were within their rights with respect to the LLC.

Farhan argues that Ghaus lacks standing to sue over these actions because, after March 2018, Ghaus was no longer a member of GPM and therefore had no stake in what happened to the company or its assets.  "A plaintiff invoking federal jurisdiction bears the burden of establishing the 'irreducible constitutional minimum' of standing by demonstrating (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision."  Spokeo, Inc. v. Robins, 578 U.S. 330 (2016).  "The need to satisfy these three requirements persists throughout the life of the lawsuit."  Wittman v. Personhuballah, 578 U.S. 539, 543 (2016).  Given that Ghaus sold his interest in the company in March 2018 for consideration in a valid contract, as discussed above, he cannot show injury in fact from defendants' actions in June and July 2021.  He therefore lacks standing to pursue these claims.

Farhan contends that co-plaintiff GPM also lacks standing to sue over events in 2021, because it is a new company registered by Ghaus in 2023.  Plaintiffs argue that GPM has standing to sue because, "even after dissolution or cancellation," it exists to "pursue recovery of any debts or obligations owing to it[.]"   (ECF No. 124 at 24.)  Plaintiffs cite 6 Del. C. § 18-805, which provides that, when a Delaware LLC is cancelled by the filing of a certificate of cancellation, "the Court of Chancery," upon a showing of good cause, "may appoint" one or more managers of the LLC as trustees authorized to "collect the debts and property due and belonging to" the LLC. The powers of these court-appointed trustees "may be continued as long as the Court of Chancery shall think necessary for the purposes aforesaid."  Id.  The Delaware Court of Chancery has not appointed Ghaus (or anyone else) to collect debts owing the LLC cancelled in 2023, and plaintiffs' argument is unavailing.

As explained above, the "California limited liability company" called G. and P. Malik LLC that is a plaintiff in this action is not the Delaware LLC that is the subject of the events at issue.  Because this new California LLC cannot show injury in fact from defendants' actions in

1    June and July 2021, it lacks standing to pursue this action.

2           As the Court has concluded that both Ghaus and GPM lack standing to bring these claims

3    against Farhan as a matter of law, it does not reach the parties' arguments as to statute of

4    limitations or the merits of the conversion and elder abuse claims.  Farhan is entitled to summary

5    judgment on plaintiffs' claims.

6           IV.    John's Motion for Summary Judgment

7           The Court next considers plaintiffs' claims of fraud, conversion, and elder abuse against

8    John.  The undisputed facts are substantively the same as set forth above, as are the Court's

9    determinations about the MIPA's formation and effect, and whether co-plaintiff GPM is the same

10   entity that was the subject of the pre-2023 events in this action.

11          For the reasons discussed above, the Court concludes that Ghaus does not have standing to

12   sue John over his actions in June and July 2021.  Nor does co-plaintiff GPM have standing to sue

13   over events predating its existence.  Thus, John is entitled to summary judgment on the

14   conversion and elder abuse claims by Ghaus and all claims by GPM.

15          The remaining claim is Ghaus' fraud claim against John over events in 2018, when Ghaus

16   signed the MIPA.  Under California law, the elements of fraud are: "'(a) misrepresentation (false

17   representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent

18   to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'"  Yagman v.

19   Kelly, 2018 WL 2138461, *11 (C.D. Cal. March 20, 2018), citing Lovejoy v. AT&T Corp., 92

20   Cal. App. 4th 85 (2001).  In support of his fraud claim, Ghaus alleges that John tricked him into

21   signing the MIPA in March 2018.  Specifically, he claims:

22                 [John] made a material representation . . . when he claimed that he
                   would draft the sales contract and LLC tax returns relating to the sale
23                 of the LLC real property in 2018.  Implicit in that representation, was
                   the fact that John would not misappropriate the funds from the sale
24                 of the LLC property or surreptitiously effect a buyout of [Ghaus']
                   interest in the LLC in favor of himself and his brother Farhan.  That
25                 representation was false, as the Malik defendants did purportedly
                   attempt to effect a buyout of GM from the LLC . . . [.]
26

27   (TAC, ¶ 37.)

28

                                                18

The Court first considers whether this claim is timely.  The statute of limitations for fraud is three years and accrues when the aggrieved party discovers "the facts constituting the fraud[.]" Cal. Civ. Code § 338(d).  The discovery rule "delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action."  Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 807 (2005).  Inquiry notice occurs "when the plaintiff suspects or *should suspect* that her injury was caused by wrongdoing, that someone has done something wrong to her."  Jolly v. Eli Lilly & Co., 44 Cal. 3d 1103 (1988) (emphasis added); see also Ward v. Westinghouse Canada, Inc., 32 F.3d 1405, 1408 (9th Cir.1994) ("Under California law, the question of when [the plaintiff] was on inquiry notice of potential wrongdoing is a factual question.").  Here, there is no genuine dispute of fact that Ghaus was on inquiry notice that John had "surreptious[ly]" bought out his interest in March 2018, when Ghaus had the opportunity to read the MIPA, or, at the latest, on May 4, 2018, when John texted Ghaus that he was "no longer a member" because "I personally bought you out for $1.15 million."  At that point, Ghaus should have known that John had "done something wrong" and that the document he signed was not what he allegedly believed it was.

This action was filed more than five years later, on July 10, 2023, though Ghaus filed an earlier action.  In December 2021, he filed a complaint in the New York Supreme Court asserting a fraud claim against John.  (ECF No. 125-6 at 164-202 (Ghaus' Ex. 10.)).  On June 26, 2023, the New York court granted Ghaus' motion to dismiss the case without prejudice to refiling in California.  (ECF No. 125-6 at 203-204.)  Under California law, "'[a] party's voluntary dismissal without prejudice does not come equipped by law with an automatic tolling or waiver of all relevant limitations periods; instead, such a dismissal includes the very real risk that an applicable statute of limitations will run before the party is in a position to renew the dismissed cause of action.'"  Holt v. Country of Orange, 2021 WL 4352373, *5 (C.D. Cal. March 17, 2021) (quoting Hill v. City of Clovis, 63 Cal. App. 4th 434, 445 (1998)).  Absent tolling, the fraud claim is untimely.

Moreover, assuming *arguendo* that the claim is timely, the idea that John tricked Ghaus into signing the MIPA is the same theory of fraudulent inducement discussed above.  Its main flaw is that Ghaus neglected to read the MIPA before signing it.  See Barnes, 2014 WL 4929052

19

1   at *4 (plaintiff's failure to read contract before signing "is a result of his own negligence and does

2   not amount to fraud").  Any misrepresentation John made about the nature of a straightforward,

3   two-page contract could have been addressed by reading the contract itself.  As the claim is

4   untimely and there is no genuine dispute of material fact, John is entitled to summary judgment

5   on the fraud claim.

6        Accordingly, IT IS HEREBY ORDERED THAT:

7    1.  Farhan Malik's motion for summary judgment (ECF No. 120) is GRANTED as to all

8        claims against him;

9    2.  John Malik's motion for summary judgment (ECF No. 123) is GRANTED as to all claims

10       against him;

11   3.  All pending dates in this action are VACATED; and

12   4.  The parties shall meet and confer as to the remaining counterclaims and file a joint status

13       report, including any proposed deadlines, no later than fourteen days from the date of this

14       order.

15   Dated:  November 7, 2025

16                                              _____
                                               CAROLYN K. DELANEY
17                                             UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23   2/malik1344.sj mtns

24

25

26

27

28

                                        20